HUNTINGTON *vs.* HENRY LYMAN and Company.

Where a party seeking to charge a partnership is apprised that the transaction is not for their benefit, and the act is not in the usual course of business, *prima facie* the firm is not holden.

It is not necessary, to secure a person giving credit to a partnership, that he should know, or believe that each individual member of the firm would approve of the transaction ; but it is necessary that he should *not* know that the debt attempted to be secured was not the debt of the partnership, or the property sold, was *not* to inure to their benefit, in the absence of all proof of the assent or approbation of the party attempted to be charged.

*Bennington
February,
1824.*

THIS was an action of *assumpsit* on a promissory note for the sum of one hundred and ten dollars, bearing date the 19th of February, 1820, and signed Henry Lyman and Co.

On trial upon the general issue, at the last February term, the defendants admitted the execution of the note by Henry Lyman, and the existence of a partnership between the defendants at the time the note was executed, but resisted a recovery on the ground that the note was given for the purchase of a horse, that the articles of partnership did not extend to the purchase and sale of horses ; and also that the plaintiff knew at the time that the horse was not purchased for the benefit of the company.

On the part of the defendant, articles of partnership were produ-

ced, executed by Henry Lyman and John Boardman, and bearing date the 20th March, 1813, by which it was agreed, " that the said partners enter into copartnership in the mercantile business in Shaftsbury, and that the said Henry Lyman should attend to and transact the business of the said concern. in all its various branches, with the advice of the said John Boardman."

<em>Bennington February, 1824.<br>Huntington vs. H Lyman & Co.</em>

It appeared by an agreement in writing, on the back of said articles of partnership, signed by the said Henry Lyman and Clarissa Boardman, bearing date the 20th day of March, 1814, that said partnership having been dissolved by the death of the said John Boardman, they the said Henry Lyman and Clarissa Boardman agreed that the business should be continued in the name of Henry Lyman & Co. for their joint benefit.

Daniel Huling, on the part of the defendants, testified that he heard the plaintiff say, that he had sold a horse to Henry Lyman, and had taken Henry Lyman & Co's note for it, for one hundred and ten dollars, and that after the death of John Boardman, Mrs. Boardman continued the business, at the same store in place of her husband.

The defendants then read in evidence the deposition of Horace Barlow, who testified, that some time in the winter or spring of 1820, thought it was in the month of February, he was knowing to Daniel Huntington's selling a horse to Cornelius Clarke, or Cornelius Clarke and Henry Lyman, for the purpose, as he understood, of matching a horse which Clarke at that time owned. And it was, at the time of the sale, talked over between Huntington and Clarke, that they wanted to purchase the horse to match one which Clarke then had. The price of the horse, he thought was one hundred and ten dollars; and a note was written for the same, either payable to Daniel Huntington, and signed by said Clarke and Lyman, or drawn payable to said Huntington, and signed by said Clarke, and indorsed by Lyman. This note Doctor Huntington seemed unwilling to take, and assigned as a reason, that he did not want Clarke's name on it, but wished a new note drawn, and signed by Lyman, in the name of the company of Henry Lyman & Co. and it was accordingly done, and the first note destroyed. The horse that was purchased was received by Clarke, & by him kept for three or four months, and then, as he understood, was sold in the State of New-York.

*Bennington*
*February,*
1824.

Huntington
*vs.*
H. Lyman
& Co.

:

On being questioned, he further testified that he lived with Henry Lyman at the time the horse was purchased.—That the horse was never in his keeping, and understood at the time that the horse was purchased to match one which Clarke had.—That he presumed Mrs. Lyman had no knowledge of the purchase of the horse.—That he had been a clerk in the store about four years.—That Mrs. Lyman intrusted the business wholly with Lyman; and had no means of knowimg any thing of the affairs of the store, except from a general inventory of all debts due to, and owing by the store, made by Lyman; she was in the habit of coming to Shaftsbury once a year, when she examined this inventory.

Daniel Huling, called by the plaintiff, testified that he had no knowledge of the avails of the horse for which the note in question was given, having gone for the benefit of the company; but that Lyman went to Albany with the horse and his mate, with Clarke; and came back with a grey span. He knew that Lyman was in the habit of purchasing horses for two or three years, and taking them to Troy, Albany and Hartford to sell.

Gershom *Waldo*, a witness on the part of the plaintiff, testified that he knew of Lyman's buying horses to raise money to pay debts. And, at one time, while at Mrs. Boardman's in Troy, was asked by her if he knew how Lyman got along with business; and inquired if he knew whether Lyman had got a horse for her, and said that Lyman had already got a horse for her use, which did not suit, and as he was trading a good deal in horses, he was to take this one back and got her another. Mrs. Boardman said she was afraid Lyman was trading in horses too much for their benefit. The witness said he knew of Lyman's purchasing many horses, and that Mrs. Boardman came out to Shaftsbury about once a year and stayed two or three days or a week.

Ezra Olin, on the part of the plaintiff, testified that he knew Lyman had been in the habit of purchasing horses for three or four of the last years of his deal; had seen Lyman sell horses for money, and had known him to take horses to Troy, Albany and Hartford to sell. At one time Mrs. Boardman told him, the witness, that Lyman had purchased a horse for her that did not suit her, and she wished Lyman to take the horse back, and get her one that would suit, as he was in the habit of purchasing horses. Mrs. Boardman.

while at Shaftsbury in the spring of the year 1818 or 1819, told him, the witness, that she had taken an inventory of the cattle, horses, lumber and goods. And, on being cross-examined, the witness said, that at the time alluded to, he came into the store, and seeing the goods down on the counter, he inquired what that meant: and Mrs. Boardman answered, that they were in the habit of taking an inventory of the goods every year, which they were then doing, and that this was all she said. The witness further said that he once saw the horse in Lyman's stable ; and that the plaintiff had lived within one half mile of the store ever since it was opened.

Gardner Bates, on the part of the plaintiff, testified that in the summer, about four months before Lyman failed, he, the witness, sold a horse to Lyman for eighty-five dollars, and took a company note for it, which he transferred, and it came back into his hands. He afterwards called on William Boardman, who after some hesitation paid it. He told William Boardman that the note was given for a horse.

Jonathan Slocum, on the part of the plaintiff, testified that he sold a horse to Lyman for eighty dollars, and took a company note for it payable the first of April after Mrs. Boardman took the books.—That he, the witness, transferred this note to John H. Olin, jr. January before it fell due, he settled with William C. Boardman the accounts of the firm, and told him that he had got the aforesaid note. When the note fell due, he understood that William C. Boardman paid it ; but also learnt that John H. Olin threatened him with a suit if he did not pay it, and that he would attach the goods in the store. I told said William C. Boardman that said note was given for a horse, and he afterwards told me that he had paid it.

Moses Fay, on the part of the plaintiff, testified that he sold Lyman a horse for eighty dollars—that Lyman paid him some money towards it.—That he had at different times sold Lyman three or four other horses, and took his pay, sometimes out of the store, and sometimes in money and notes against others, in favour of the company.—That Lyman had a family, and carried on considerable farming business.—That he, the witness, had taken two or three horses to market for Lyman and brought back the money to him.

Benjamin Brown, on the part of the plaintiff, testified that in No-

*Bennington
February,
1824.*

*Huntington
vs.
H. Lyman
and Co.*

vember, 1819, he sold a horse to Lyman, and took a note against the company payable in one year, and William C. Boardman paid the note; he, Boardman, knew that the note was given for a horse, and Lyman told him that it was sold for the benefit of the store.

W. J. on the part of the plaintiff, tistified that he sold Lyman two horses in payment of a debt due from him to the company, and which were credited on the company book.—That he sold Lyman another horse for which he paid him the money.

Nathan Burton, on the part of the defendants, testified that he was one of the Judges who tried the cause in the Court below, but did not recollect that Waldo testified that Mrs. Boardman said that Lyman was trading too much in horses for their benefit.

William C. Boardman, on the part of the defendants, testified that on the 20th of October, 1820, an inventory was taken by witness and Henry Lyman, preparatory to a dissolution of the partnership, of all the company property at Shaftsbury ; which comprehended goods in the store, lumber, cattle, and two or three horses. And some articles were inventoried which the witness believed to be the individual property of Henry Lyman.—That on the 23d of December, 1820, the whole property of the company was transferred by Lyman to the witness' mother, Clarinda Boardman, she undertaking to pay all the debts against the company ; and he, the witness, was made agent for closing the concern.—That on the 16th of January, 1822, a dissolution of the copartnership took place ; and about the first of February following, Lyman ran away.— Shortly after Lyman ran away, Gardner Bates demanded 'payment of a note he held against the company, and threatened an immediate suit on it if it was not paid, upon which he, witness, paid the note.—That at the time he paid the note to Mr. Brown, he supposed he was bound to pay all the notes that had the company name upon them ; but he was afterwards directed by Mr. Russel of Troy, and then by his mother, to pay no debts that were not contracted within the limits of the company concern.—That the above note was paid under a misapprehension of the obligation of the company, and without any knowledge or direction of his mother. The witness says that he has no recollection that at the time he paid the above notes he knew they were given for horses.—That the note in favour of ·Jonathan Slocom, and paid to John H. Olin, was paid

without the witness knowing for what it was given; and when he, the witness, afterwards learnt that it was given for a horse, he expressed his regret that he had paid it.

Henry Lyman, at the dissolution of the partnership, claimed as his individual property a saddle and bridle, and he thinks one of the horses. His mother used to make a visit to Shaftsbury about once a year, and usually stayed there two or three days.

Freeborn Mattison, on the part of the defendants, testified that Cornelius Clarke had the horse in question the whole of the next winter after he was purchased; and that previous to the purchase Clarke had a bay horse for which he wanted a match, and inquired of the witness if he knew of a match for him: witness recommended the horse in question, and he afterwards saw Clarke with the horse, but never saw the horse in Lyman's possession.

David Mattison 2d, on the part of the plaintiff, testified that three or four years ago he was driving the horse in question with his mate from Troy in company with Clarke.—Three or four miles this side of Troy they met Lyman, who stopped them, and said the horses should never go back again into Vermont, and took them and with Clarke went towards Troy, and he never saw the horses afterwards.

Upon this evidence the Court were of opinion that the plaintiff was entitled to recover, and under their direction the Jury found a verdict for the plaintiff.—To which opinion of the Court the counsel for the defendants excepted, and filed a motion for a new trial, upon which the cause came on to be heard at the present term.

*Bennet* for the defendants. It will be contended on the part of the defendants that they are entitled to a new trial on the following grounds:

1. The note in question was executed by Henry Lyman, in the name of the company for property, known at the time to the vendor to be without the scope of the partnership concern, as originally established; and, of course, not obligatory upon the firm.

2. From the whole case, no act appears to have been done by Mrs. Boardman to extend the partnership to the purchase of horses, on a credit, from which her assent to the giving of the note in question can be presumed.

To bind Mrs. Boardman to the payment of this note, she must

*Bennington*
February,
1824

Huntington
*vs.*
H. Lyman
and Co.

have assented to it at the time of its execution; though this assent might be proved by *previous, concomitant,* or inferred from *subsequent* acts : such subsequent acts as always furnish evidence of the assent accompanying the contract.

3. We shall not take up the time of the Court with an examination of the evidence relative to an extension of the partnership.; for admitting all that the plaintiff contends for, that the partnership was extended to the purchase and sale of horses, yet it is very clear that the defendants are entitled to a new trial. The law is well settled, that if a person take of one partner the partnership security for property, which he knows at the time, is for the individual use of that partner, though within the scope of the partnership business, the firm are not bound: it is a fraud upon the other partners. Swift. Dig. 342. 4 John. Rep. 271. 2 Esp. Rep. 523. 2 Caine's Rep. 246.

Much less would the firm be bound where the property was for the use of a *third* person.

In the case at bar, it appears from the statement of the evidence, that it was proved on trial to the Jury, that the horse was purchased for the use of one Clarke, and this known to the vendor at the time of the sale. These facts, if believed, constituted a most ample defence, and it was the peculiar province of the Jury to weigh the evidence.

*D. Robinson* and *Merril* for the plaintiff. A partnership between country merchants, for carrying on trade, is not a limited or special partnership : it extends to all kinds of personal chattels. Swift. Dig. 339. And if a note be given in the name of the firm for an article, which is or may be necessary for transacting its concerns, all the partners are holden. 4 John. 251.

In this case no notice was ever given to the world of the nature and extent of the partnership ; of course, all persons dealing with Lyman, the acting partner, could judge of the extent of the partnership only by the extent of his deal. And, from the evidence in the case, it appears, not only that Lyman dealt in horses—that he continually purchased and sold on the partnership account, but that Mrs. Boardman had a perfect knowledge of it.

But it is said in this case, that, if the partnership did extend to the purchase and sale of horses, yet the horse in question was not

purchased for the benefit of the company, but for the use of Clarke, *Bennington* a third person; and that this was known to the plaintiff at the time: February, and, therefore, it is said, that the company cannot be liable. 1824.

We are not disposed to controvert the principle, that if a person Huntington take the partnership paper, knowing it not to be on partnership account, the partnership are not liable; but this is always considered and Co. a question of fraud. 7 East. 210. 13 East. 175, Ridley et al. *v.* Taylor. 4 John. Livingston *v.* Rosevelt. 11 John. 554, Doty *v.* Bates et al. Chit. on Bills 45. 1 Camp. 185. And the fraud in such case must be clearly proved, in order to exonerate the company. But the evidence in this case does not even prove the fact that the horse was not purchased for the benefit of the company. That the horse was purchased for the use of Clarke. and that Clarke received the horse at the time of the purchase, does not prove this fact; for the horse might have been sold to Clarke at the time of the purchase, on account of the company, but it cannot be in the power of the plaintiff to show this; he has none of the books and papers of the company by which to show it: But it must have been in the power of the defendants to have shown that the horse was not purchased and sold on the company account. The company books and papers are not exhibited, nor does William C. Boardman, who settled the accounts of the company concerns, and held the books and papers, say one syllable respecting the deal between Clarke and the company. It must then, we insist, be taken that the facts in relation to the deal between Clarke and the company, could not be safely disclosed by the defendants. At any rate there is no proof that the purchase and sale of the horse were not on the company account: And the plaintiff having shewn that the purchase and sale of the horse were within the general scope of the partnership deal, and the defendants having failed of shewing that this particular purchase was not made for the benefit nor intended for the benefit of the company, the company must on every principle be bound to pay the note.

Skinner, Ch. J. delivered the opinion of the Court. This action is founded upon a note of hand, executed in the name of Henry Lyman & Co. to Daniel Huntington the plaintiff. The firm of Henry Lyman & Co. consisted of Henry Lyman of Shaftsbury, and Clarinda Boardman of Troy. The consideration of the note

*Bennington*
February,
1824.

Huntington
*vs*
H. Lyman
and Co.

was a horse sold by Huntington.  At the trial the counsel for the defendants, or rather for Mrs. Boardman, resisted a recovery on the ground that the partnership was for such mercantile purposes as usually appertain to a country store, and did not extend to the purchase and sale of horses ; and also, that the plaintiff at the time of taking the note, knew the debt was not the debt of the partnership, but the purchase of the horse was by Cornelius Clarke, a third person, and for his benefit, or for that of himself and Lyman.  To oppose the first part of the defence, the plaintiff relied on proving that the partnership had been extended, by the transactions of the partners, to the purchase and sale of horses upon credit, and thereby he was authorized to take the note.  And from the case as allowed it would seem, that the attention of the Court was wholly drawn to the testimony upon this point, and that the other ground was overlooked in directing a verdict for the plaintiff.  Whether the testimony was sufficient to justify the Court in directing a verdict upon the question of the extension of the partnership is not necessary now to examine.  In deciding upon this application for a new trial, the attention of the Court has been directed to the inquiry, Is the plaintiff entitled to recover, if he knew at the time of taking the note, that the contract was not for the benefit of the partnership ?  Was there evidence given to the Jury tending to prove this, and which they ought to have weighed ?

In the case of Arden *v.* Sharp and Gilson, although there was no proof direct, that the transaction was known to the plaintiff to be for the sole benefit of Gilson, one of the partners, Lord Kenyon says, " When the party, who brings the action, took the bill, with the indorsement of one partner only, (Gilson indorsed in the name of the firm) and was informed that the transaction was to be concealed from the other, he cannot sue the partnership ; the transaction *indicates* that the money was for the partner's own use, and was not raised on the partnership account."  The same Judge again says, in the case of Wells *v.* Masterman et al.—" If a man, who has dealings with one partner only, draws a bill on the partnership, on account of those dealings, he is guilty of a fraud ; and in his hands the acceptance made by the partner is void."  The doctrine here expressed is, a knowledge that the dealing is not for the firm, renders the security fraudulent and void.  In the first case the circum-

stance of the partner's having requested the transaction *concealed*, without other evidence, was considered sufficient to establish both facts, that is, that it was not for the firm, and knowledge thereof in the party. In the case of Sheriff *v.* Wilks et al. the same principle is fully recognized by the whole Court, and in many other cases. The case of Ridley *v.* Taylor, which is much relied on by the counsel for the plaintiff, cannot be considered as opposed to this principle. Lord Ellenborough, in delivering the judgment in that case, says, "If this were distinctly the case of a pledging, by one partner, of the partnership security, for his own separate debt, without the authority of the other, we should have no hesitation in pronouncing a bill, drawn under such circumstances, void, &c."

Bennington<br>February,<br>1824.<br><br>Huntington<br>*vs.*<br>H. Lyman<br>and Co.

The law we believe to be settled, that where the party seeking to charge the partnership is apprized that the transaction is not for or on account of the firm—that the credit is not for their benefit, and the act is not in the usual course of business, *prima facie* the firm is not holden. The *onus probandi* then falls upon the plaintiff. He must show the authority or approbation of the party attempted to be charged. 1 Sal. 126, 1 East. 49. 4 John. R. 251. 2 Esp. 525, 731. 8 Vez. 544. Liv. D. 342. The remaining inquiry is, was there testimony given to the Jury tending to prove Huntington's knowledge? And of this no doubt can be raised. If the testimony of Barlow is to be credited, and, of its credibility the Jury ought to have been permitted to decide, not only knowledge, but *covin* is fairly inferable from the whole transaction. The horse, he says, was purchased for Clarke, and to mate one that he owned, and this understood by Huntington at that time. The note of Clarke indorsed by Lyman, or of Clarke and Lyman jointly, was executed. Huntington wished a new note drawn and signed by Lyman in the name of the firm, which was done, and the first note destroyed. If the credit of Clarke, or Clarke and Lyman were good, it would have been relied upon; but if not, and the credit of Mrs. Boardman was demanded, there ought to have been evidence of her consent, express or implied. But, so far from this, the evidence not only shows that Huntington knew it was not a partnership concern, but on the contrary, from the execution of the first note by Clarke and Lyman, it was fairly to be inferred that neither the usual course of business, nor any assent of Mrs. Boardman, would warrant the

*Bennington February, 1824.*

*Huntington vs. H Lyman and Co.*

attempt to charge her. From the facts the Jury might very naturally conclude, that Huntington was persuaded, that if Mrs. Boardman was charged, it must be effected without her knowledge or consent,—She resided at a distance from the store where the business of the partnership was transacted, and her capital constituted the means employed.

It is not necessary, to secure a person giving credit to a partnership, that he should know or believe that each individual of the firm would approve the transaction; but it is necessary that he should *not know* that the debt attempted to be secured was not the debt of the partnership, or the property sold was *not* to inure to their benefit, in the absence of all proof of the assent or approbation of the party attempted to be charged.

The verdict therefore must be set aside and a new trial granted.